May it please the Court, my name is Vince Barbera and I represent the appellant Leonetti's Frozen Food, Inc. We asked the Court to reverse the decision of the District Court, which granted summary judgment in favor of the appellee, Crew, for the reasons that we outlined and set forth in detail in our brief. Today, because the Court's standard of review of the District Court's decision is de novo, I want to take the limited time that I have to highlight the evidence that was adduced by Leonetti's in response to Crew's motion for summary judgment that renders the summary disposition of its claims improper. I've reserved just five minutes for rebuttal. In response to that motion for summary judgment, we presented evidence that the ill-advised and ill-timed email by Crew's principal approximately caused Leonetti's to lose what might have been a once-in-a-lifetime business opportunity with Sam's Club. The evidence that we presented was not limited solely to the timing of events. There was a wealth of circumstantial evidence that this email and not issues with the product itself was the factual cause for Sam's Club's decision. What's your best direct evidence? You went quickly to circumstantial. I don't know that we have direct evidence, Your Honor, but I would say that the wealth of circumstantial evidence allows us to meet that burden. We did cite the case of What about the comment, I'm kind of making an odd argument here, but what about the comment that this was a serious matter? That was by Mr. Hawthorne, right? Well, I suppose that could be considered direct evidence for Mr. Hawthorne. Why do you think it's not direct evidence? Well, he does remark that he did not think, he does say that the email was not the cause. And so therefore, his actions and other statements that he made with respect to the email could be inferred as circumstantial evidence. However, I guess it could be also interpreted as direct evidence, but be that as it may, we can meet our burden. But didn't he also say grievous error? He said it was a grievous error. And a mistake. And a mistake. And very serious. That's correct, Your Honor. Unethical. Unethical. He remarked that he thought the conduct that was suggested would be unethical. Sarcasm? That's in the question, I don't know whether it's in the answer, sorry. That's correct. Now, we have, in the brief, this is like a case against Hawthorne, in the briefs. It's very strange. Approximate cause has to be related to a tort claim. And I have difficulty understanding the pleading, I haven't read the pleading, but the district court said the tort claims were negligence and trade libel. Breach of fiduciary duty in some jurisdictions is and in others isn't. But what's the trade libel? What's the element, what's the operative element of trade libel here? That the statement was false and Which statement? The statement by the defendant, Crewe. So there was the email from Crewe's principal, Jeff Campigli, when he stated, or he suggested that Robert Opasso, Leonetti's principal, would, and he would use slides two through five of the presentation that was prepared exclusively for SAMS and a presentation to COSCO. No evidence it was false. Well, there was The whole thing is, I can understand maybe the negligence, although I don't see how hitting reply all is going to be actionable negligence in almost any circumstance, particularly among the parties cooperating to achieve something positive with a customer. And so the, I mean, the proximate cause, I can understand why the district court said, well, yeah, because it's the cause of what's the tort underlying it. Right. The email was not false. And really, Your Honor, the focus of the issue was proximate cause with respect to the negligence of the email. The email, and there's a professional negligence claim, which was the principal claim, and the email itself was negligent. And that as a, as a, the representative for Leonetti's interfacing directly with the client or the prospective client in this instance, SAMS Club, they had a duty to use their professional care, the standard of care, to act professionally and to, you know, take care not to send emails suggesting that they would use information that was developed by their client. From my curiosity, what's your best case on that, on that theory of liability? You know, there isn't a case that's directly analogous in terms of all the facts, but we do cite the Sixth Circuit opinion in advance signage versus OPTEC in our brief. And in that case, you have an email from a competitor of the plaintiff. That's the typical situation. Here we've got, here we've got teammates, and one of them makes a mistake, and the other one, for spite or grief, sues them, because the customer exercises its prerogative to walk away. Very strange. It may be strange, Your Honor, but we do have Mr. Campigli, who represents, and it's in the record that he believes that his email could cost Leonetti's the business. So when you make a mistake, he admits it's a mistake. Yeah, well, mistakes do that all the time. Right. But that doesn't mean, that doesn't mean they're tortious. Well, in this instance, it was a mistake. It was negligence to send that email. And we have, we have proof that it was negligence to hit one button. It was. And in today's day and age, that can be a serious problem. And even if it's a joke or if it's merely a lack of exercise of professional judgment, that's an important thing to consider. You know, this is a, the record, I think, is pretty obvious that a lot of the communication that went back and forth was by email. So it's not as though you have a one-off situation where he sends a joke email, you know, completely inadvertently and it has a devastating impact. You've got a lot of emails back and forth. He's BCC'd on it. Wait, they're all after the fact. I'm sorry? They're all after the fact and apologizing and so forth. He does apologize. But there's nothing, this email stands alone in terms of breach of professional negligence. That's true. And I don't think that there's, but the evidence, as we suggested and as we pointed out throughout our brief, indicates that it was this email, that this email was. Was Cruz's representation of plaintiff vis-a-vis Costco known? Was that a secret relationship? I don't know if the relationship was known prior to when that email was sent. Was it confidential in the view of Leonetti's? I don't know that it was confidential either, but there is evidence of record that suggests that perhaps the relationship was not known and that it was something that wasn't. Not known is different than confidential. In other words, if Sam's Club had learned about the representation of Costco properly, it might have said, I don't want to do business with someone who's doing the same kind of business with my principal competitor. I'm looking for unique products to beat Costco over the head with. Right. And they did say that. And that was what part of the problem was. The suggestion that Leonetti's would use a product that was developed specifically for them with Costco was a big problem. That was what Mr. Hawthorne testified he considered would be unethical. I didn't say the same product. They're making, they don't want the same family of, these are, well, I don't know about the relationship with Costco, but with Sam's Club, it was a Stromboli product to make in a pizza oven, which is probably ripe with technological difficulties to begin with. If they're, and then apparently somebody says to Hawthorne, well, we wouldn't, we weren't, we aren't presenting the same ingredients to Costco. Well, sure, they're not, it's not the exact same product, but maybe Sam's Club doesn't want it. If it's going to have Stromboli to cook in its pizza oven, it doesn't want Costco to have anything like that. That hypothetically could be the case. We do have Hawthorne. I'd probably, I'd probably wager a fair amount, give some odds that that was the case. Well, there's no evidence in the record that it was because Mr. Hawthorne points to product issues, not that they were developing a product that happened, that they may also, a similar product might also be pitched to Costco, which we don't have evidence of. What about the, well, we certainly wouldn't, we certainly wouldn't present the same product to a competitor, certainly not your number one competitor. So everyone in the Leonetti's crew family of team knew that they were, that they were pushing, they were, they were attempting to get business, understandably, because it would double the pie, from competitors who might not want to deal with someone who's dealing with the other one. And that's, that's a fair point. Although Hawthorne did testify that he understood that, that, you know, vendors could be pitching similar ideas to other, to other companies. Whether he knew specifically at the time that Costco was in the running, I don't know. But they did disclose that Costco, that they were, that Campigli represented Leonetti's with respect to Costco. Robert Opasso admitted that in the year prior, they had pitched a similar product, not using the same ingredients. But your point is also important because it does demonstrate that Campigli and crew understood that just that singular email was a big deal and it could cause them to lose business. They apologized for it. They realized it was a problem. They realized that it was a problem, that it was the number one competitor, that there was a suggestion that they would use Sam's, the product that they developed for Sam's. This is closer to a trade secret case than a negligence case. Well, I don't know if there's, if there's anything trade secret. No, it's not a trade secret. Right. It's the same, it's the same concerns that, that drive trade secret efforts. I think that's a fair point, Your Honor. And so somebody leaks, somebody leaks, you're negligent if you leak something that isn't a trade secret, but you wish it hadn't gotten out? That's true when the standard, the standard of care in this, in this instance is to not do something like that. And we have evidence that, where does that, where does that, advance doesn't get that for you. What, what does? In terms of the standard of care? Yeah, one, one member of a team releasing information that, that although not confidential or a trade secret, it was not before known and is therefore liable to its teammate for negligence. Well, I can't point you to a, to a case, I bet there isn't one, frankly, but of course there's a case on everything somewhere. Well, that, that may be true, Your Honor. What I would say is that, that the, the, the defendant crew admits that this is something that they knew they shouldn't have done, that they thought could cost Leonetti's business by doing it. And we've presented the evidence that this email hit with the resounding thud at Sam's Club. We have Hawthorne saying, and I realize I'm running out of time, but Hawthorne saying that this is, this is, this is something that he considered unethical. They were supposed to move forward and every moment up until when they passed that final test and until that email happened, and then they went dark. If Campigli had been a, had been a Leonetti's employee, he could be fired for this. Could he be sued? Yes. Supposing, I suppose. His employer could sue him? I'm sorry? His employer could sue him for leaking something that was damaging? I misunderstood. Hmm? I misunderstood the question. His company was sued in this instance by a client for who he was retained to represent their interests and then failed. He was an independent contractor. He could be a, could well have been an employee. They used their employees in 2010. They got, they went and found proof in 2014. So if he'd been an employee, he could be fired. Could he have been sued? I doubt it. I don't know the answer to that question. I doubt it. I'll reserve the remaining two minutes of my time. Thank you. Thanks. Mr. Donovan? May it please the Court, Applee Crew Inc. urges this Court to affirm the summary judgment entered by Judge Brooks. Affirmance is required because Leonetti's did not meet proof with proof when the summary judgment motion was supported by. Counsel, they don't have to meet proof with proof. We take all the proof and interpret the facts favorable to them, right? Summary judgment. Do you agree? I don't agree. You don't agree? That's the standard summary judgment for this Court. Inbank, Torgerson, I could give you 20, 30 cases. Tell me what you're saying. This Court has said that when a summary judgment motion is supported by evidence by the moving party, the non-moving party may not rest on the mere allegations of the pleadings but must meet proof with proof. They're not doing that. They're drawing, there's all kinds of things to draw inferences from that they're drawing, urging us that the District Court failed to draw inferences that it was required to fail to draw by our well-established Rule 56 jurisprudence. Yes, Your Honor. That's not, they didn't meet proof with proof. That's just, that argument gets nowhere. Your Honor, what they did was raise issues challenging the credibility of Mr. Hawthorne. Well, that happens all the time in summary judgment. Of course it does. If it's a legitimate credibility issue and it's a material fact, then summary judgment's denied. There are always credibility issues with any witness who testifies. The reasonableness or unreasonableness of their testimony can be evaluated by the prior fact. No, you can't defeat summary judgment just by saying, I think a jury could disbelieve that guy. Well, that's what they're doing, Your Honor. No, it's not what they're doing. They're saying he said enough inconsistent things and made enough, did enough things like telling his boss when he promised he wouldn't do that. He did enough things to suggest that he's not, I mean, objectively suggest he's not credible. And if I could focus on each of those things, Your Honor, and explain why they are not evidence to defeat summary judgment. Okay, but it's got to be cumulative. We don't cherry pick them. I understand, Your Honor. Start off with this cumulative point, Judge Loken. Mr. Hawthorne testified, despite all of the things he said about this is a serious matter and he may have been confused about the test, despite all of these things he testified to, his testimony was unequivocal. The email was not a factor in my decision. It did not enter into it in any way. I considered it a poor attempt at humor. Counsel, what if he's not credible? What if a fact finder finds him not credible? Well, Your Honor, there has to be some evidence of causation. Simply saying a witness is not credible is not evidence of causation. It is that simple. Counsel, are you familiar with Tolan v. Cotton? I'm not familiar. Supreme Court case, and they've had several recently, where per curio they reverse courts of appeals for deciding credibility at the summary judgment stage. So the courts of appeals are very sensitive to the issue, saying, well, we believe this and we don't believe this and we're going to get a summary judgment. Of course. I think that is accepted law, that you don't decide credibility issues at the summary judgment. That's what's happening in this case, on this part of the case. There is no credibility evaluation of Hawthorne. Mr. Hawthorne says so many different things and there was no testing after July 14, right? That is correct. Yeah, he agrees with that. And after July 14, there's the email and he says grievous error. I don't have to tell you all the words he said. Unethical, all that. And I know his conclusion is, oh, it didn't affect, but there's no testing, there's no nothing. Boy, that's credibility judgment, counsel. Don't you think there's a whole series of things that take place right up until the last test, then this email, and then all of a sudden the world changes, right? And isn't that sufficient evidence enough to give rise to a question of fact for the finder of fact? No, it is not, Your Honor. Why not? Because it is only the timing of the event. It is only the timing of the email which is the circumstantial evidence upon which appellant relies. Yes, things changed in terms of reaching a final decision, but the decision was based on all of the product experience going in the past. If I could address each of these points and then sum up cumulatively as Judge Loken has requested. For example, it would be unethical according to the testimony of Mr. Hawthorne. Mr. Hawthorne was asked if they used these slides and presentation for Costco, would that be wrong? He said yes, it would be. That it's not right? Why? It's unethical. Go ahead. It would be unethical to use That it's not right, unethical, grievous mistake. Keep going. Right. In other words, if they did use the information used in the Sam's testing for a Costco presentation, that would be unethical, but he doesn't believe that they did. He believes it was a poor attempt at humor, a joke, a sarcasm, and did not factor into his decision. Well, now wait a minute. The day after or the same day, he sends it to his boss and says this is interesting. Yes. And he was asked about that in his deposition. Well, I know. He was prepared. He knew that was coming. His lawyer knew. He was properly prepared how to answer it. But that suggests that he thought it was more than just humor or, well, it's consistent with it being a mistake. It's not consistent with the import of it being humorous. It's consistent with the corporate structure and reporting to your boss information that develops. For example, Your Honor. You just made that up there. I thought Horne and Baldwin, none of the Sam's Club superiors were deposed or submitted affidavits. That's correct, Your Honor. So you just made that up, the Sam's Club corporate structure. No, Your Honor, I did not. I took that from Mr. Hawthorne's testimony. And if I can be allowed to explain. That's not going to get you a summary judgment on that. It's the only evidence of record, Your Honor. Mr. Hawthorne testified that he sent it to Mr. Horne because Mr. Horne's his boss and because Mr. Horne would need to know if the topic came up in later discussions. For example, as Your Honor mentioned. I'm sorry. Go ahead. If it was purely humorous, that explanation doesn't wash. The fact that this company does business with Costco, its major competitor, is a fact that he would need to know. And if that came up in later discussions. Right. Okay. As you explained yourself. But he's telling his boss, we're about to do business with someone who is also presenting to our major competitor. Now, that's significant. These very PowerPoint slides. He says, we'll use these very PowerPoint slides. Is it slides two to five? Correct. That's what the Campiglia email says. Right. We could even use these slides in our presentation to Costco and then put a smiley face. Next week. Right. Next week. Next week. That is correct, Your Honor. I know. And so the question is. And a smiley face after that. Correct, yes. Yeah. Go ahead. Yes. In current email emojis kind of stuff. It was an attempt at an emoji. Yes. Right. Yes, Your Honor. He'd have been fired if he didn't send that to his boss. And they went ahead and made the deal. And his boss wakes up and sees that on Costco's shelf is the same product as he's just put on Sam's Club's shelf. And it turns out Hawthorne knew about that and didn't tell him. Hawthorne's on the street. That's essentially, I think, what Mr. Hawthorne meant. My boss needs to know. So it's nothing but humorous? Come on. But it is not a fact. That doesn't pass the red face test. Your Honor, is it a factor, is the email a factor in his decision not to go forward with the project with. Well, that's for a fact finder, isn't it? No, Your Honor. Not on this record, it is not. Based on a de novo review, this court. You haven't done a very good job of persuading us on that. Your Honor, there is no evidence other than Mr. Hawthorne's testimony. Here's what he did. Here's what he did. Here's what he did. And the time sequence. You agree there's a time sequence? There is a time sequence. That is correct. And how quickly was the deal off after January 14? What's the date it's off? February 2. Okay, so two weeks, three weeks. Have you counted the days yet? 19 days? Yes, Your Honor. Something like that. When was the next scheduled test pen? There was no next scheduled test. Well, so it's not true that the product hadn't been cleared because it had to clear a test panel? No, it would necessarily It's in your brief that, well, no, they hadn't passed all tests. They had to go to a test panel. I just said, okay, when was the next test panel? Was there one between January 14 and February 2? No, Your Honor. When was the next one scheduled? Mr. Hawthorne concluded that there was no merit enough in the product to take it to a test panel. Before they would market the product, it would have to go through a test panel, Your Honor. So that was not scheduled or on the calendar at that point. There had been some previous testing, though, obviously. There had been previous testing. Some good, some bad. And the senior vice president had told him to put this on the fast track. Yes, that is right. And yet there was no test panel, and he didn't decide until after this email that the product that had cleared a lot of production tests wasn't worth a taste test. That is correct, based on all of the testing that had been done to that date. I don't believe it. There were myriad problems with the testing, but it is the only evidence that you have, Your Honor. It is the only evidence presented to this court. I don't believe it based on objective facts. And you're acting as a fact finder at that point. Well, that's what summary judgment decision makers have to do. I disagree, Your Honor. Wait a minute. They have to decide whether any reasonable jury could find a fact contrary to your client. Correct. They don't find facts. They determine it for reason. I'm sorry. Go ahead. But the easy way to do that is to say, well, if I was on a jury, I wouldn't believe them. You know, end of inquiry. And you're making credibility determinations at that point. And I don't believe that the judge makes credibility determinations at that point. Well, he's not supposed to. Let's go ahead and step back to something that Mr. Barbera was asked, and I'm not sure we ever got a very plain answer. What do you think the standard of care is that was allegedly breached in this professional negligence case? Was it ordinary care of a person trained in the profession? Was it something other than that? Well, I think it's a standard of ordinary care based on a person in that industry, Your Honor. Agreed. So now the question is, when one looks at this e-mail, did it, in fact, setting aside causation, because that's where you're focusing, I want to know, do you think there was a breach of that duty in this particular e-mail? Absolutely not, Your Honor. Okay. Would you explain why? Yes. Your Honor, first of all, informing Sam's Club that they did business with Costco was not any secret. It wasn't a trade secret. About the presentation next week, was that a secret? Well, I don't think Sam's Club knew it. There's no evidence that they did. I'll recognize that. Or that the slides will be used next week. Yeah. If they were going to use the slides, Sam's Club did not know that. You're correct, Your Honor. Go ahead. But, no, I don't think there is any breach of the standard of care in this case because, well, first of all, in this day and age, a reply versus a reply all, and that that is an exacting standard which someone who is a food broker should follow, I don't believe that to be the case. I don't think that a court could accept that your duty is to always scrutinize recipients of e-mail and make sure you're hitting reply or reply all. Boy, a jury would be good on that, wouldn't they? Yeah. They'd understand reply and reply all. Go ahead. Yes, Your Honor, they would. Of course, now we're getting into duty and breach of duty, which were not the subject of the summary judgment motion of the district court's ruling. It certainly would have been the subject of directed verdict motions if this case were to have proceeded to trial. So I believe that ultimately the case is meritless and going nowhere, particularly without any evidence at all of causation. And again, I recognize Judge Loca and Judge Benton, your skepticism with Mr. Hawthorne's testimony, but it is the only testimony we have. When I am defending a case or prosecuting a case and I am presented with a summary judgment motion that has a deposition or an affidavit and I need to contradict it, I believe that the rules require that you do more than simply raise questions about that affidavit or testimony. It requires evidence. And it certainly would have been within Leonetti's ability to subpoena Ornn. All of the Sam's Club's records were subpoenaed. There's not a document anywhere suggesting that the email was the cause. All of the documentation is to the contrary. And Mr. Hawthorne is the decision maker. I would like to conclude with the causation allegations of the first amended complaint and see if there is evidence to support them. There are four. Paragraph 62 of the first amended complaint states, Upon information and belief, Sam's Club's buyers were furious when they received the email. No evidence of that. Paragraph 63, they believe that Campigli's explanation was a poor attempt at humor. They did not believe Campigli. There's no evidence of that. Paragraph 64 and paragraph 70 are the other allegations of causation. I urge the court to read those allegations in the first amended complaint and ask if there is evidence of that. There is not. My time has concluded. I very much appreciate the opportunity to argue and the opportunity to present before you today. I urge affirmance. Thank you, Your Honor. Thank you, Your Honor. I only have a couple of minutes, and so I want to circle back to the standard of care issue, which Judge Erickson and Judge Loken raised and to which Mr. Donovan just responded. Ordinary care would be the standard, of course, within the industry. And the problem is not so much that he admitted that he was working for Leonetti's on a product with Costco, but more so that he suggested that they would use slides two through five in a presentation to Costco. Hawthorne testified that he expected exclusivity with respect to the product that Leonetti's was developing for Sam's Club. That didn't just go without saying. In fact, Hawthorne said, no, it was said. I told crew that. So the breach of the standard of care in the industry is suggesting that you're going to use slides that were taken and developed when developing a product exclusively for Sam's Club and use them in violation of that agreement to put on a presentation to Costco. Wait, violation of what agreement? There was an understanding and an agreement between Leonetti's and Sam's Club that the product that they were developing was exclusive to Sam's Club. What document would reflect that? There's testimony from Hawthorne, from Mr. Hawthorne to that effect. Well, I can understand why that's the normal way of doing business, but they had no contractual relationship. There was no contractual relationship. However, there was an understanding that between Leonetti's and Sam's Club that the product that they were developing was going to be exclusive to Sam's Club, that it would not be shared and used for other purposes, including, perhaps most importantly, in a presentation to their competitor. And furthermore, Mr. Campigli admits that what he did was a mistake. It was a mistake because he knew he shouldn't have done what he did. He should have exercised greater caution when sending an email suggesting that he was going to use exclusively developed product information with a competitor. And for that reason, for the reasons in our briefing that we already discussed, I'd ask for the reversal of the district court so we can have the jury decide the fact issues. Thank you. Thank you, Counsel. The case has been well briefed and argued. The unusual, interesting situation will take it under advisement.